## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| RICHARD SIMKINS, III, | : | Case No. 3:19-cv-227 |
| | : | |
| Plaintiff, | : | |
| | : | |
| | : | District Judge Walter H. Rice |
| vs. | : | Magistrate Judge Peter B. Silvain, Jr. |
| | : | |
| CHRISTOPHER MCINTOSH, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## REPORT AND RECOMMENDATION[1]

This case is presently before the Court upon Plaintiff's Motion for Summary Judgment Against Defendants Dayton Osteopathic Hospital, Kettering Adventist Healthcare, Nicholas Brienza, Joshua Spears, Shawn Marien,[2] Nicole Van Horne, Shannon Ravine, David Jenkins, and attached exhibits (Doc. #161); Defendants Nicholas Brienza and Joshua Spears' Response in Opposition and attached exhibits (Doc. #171); Kettering Defendants' Response in Opposition and attached exhibits (Doc. #176); and Plaintiff's "Closing Statement in Preparation for De Novo Review re: Doc. #161 & All Other Outstanding Motions"[3] and attached exhibit (Doc. #177).

### I.     Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendation.
[2] The correct spelling is "Marein." (Doc. #176, *PageID* #1441).
[3] The undersigned construes Plaintiff's filing as his reply in support of his Motion for Summary Judgment.

interrogatories, and admissions on file, together with the affidavits, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986).  Additionally, this initial burden may be satisfied by the moving party "pointing out to the court that the [non-moving party], having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case."  *Barnhart v. Pickrel Schaeffer & Ebeling Co., L.P.A.,* 12 F.3d 1382, 1389 (6th Cir. 1993).  The burden then shifts to the non-moving party, who "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).

In ruling on a motion for summary judgment, the court is "not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091, 110 S.Ct. 1839 (1990).  Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties.  *See id*.

## II.  <u>Discussion</u>

In the early morning hours of September 13, 2017, law enforcement officers[4] were dispatched to a motorcycle accident[5] on Riverside Drive in Dayton, Ohio.  (Doc. #171-3, *PageID* #1419).  This case arises out of Plaintiff's subsequent interactions with law enforcement and numerous medical personnel.  *See* Doc. #9.  In Plaintiff's Motion, he seeks summary judgment against Defendants Dayton Osteopathic Hospital, Kettering Adventist Healthcare, Shawn Marein,

---

[4] The parties dispute which law enforcement officers appeared at the scene.  *See* Doc. #161-7, *PageID* #1085; Doc. #171-3, *PageID* #1419.

[5] As described in more detail below, Plaintiff asserts that he ran out of gas while riding a motorcycle.  (Doc. #161-7, *PageID* #1085).

Nicole Van Horne, Shannon Ravine, David Jenkins (collectively, the Kettering Defendants), Nicholas Brienza, and Joshua Spears for assault and/or battery and intentional infliction of emotional distress. (Doc. #161).

In support of his Motion for Summary Judgment, Plaintiff attached his affidavit. (Doc. #161-7). Plaintiff begins his affidavit by explaining his history with Defendants Brienza and Spears, explaining that they "carry a grudge" against him because Defendant Spears "previously falsely charged [him] … with assaulting a police officer and obstruction of official business …." *Id.* at 1085. After a jury trial, Plaintiff was acquitted of the charges. *Id.*

Turning to the events of this case, Plaintiff reports that on September 13, 2017, at 1:33 a.m., he was riding on a motorcycle and ran out of gas. *Id.* Plaintiff was "fiddling with the reserve gas tank switch" when Defendant Brienza arrived at the scene. *Id.* According to Plaintiff, Defendant Brienza exited the car, drew his pistol, and pointed it at Plaintiff. *Id.* Plaintiff immediately raised his hands and asked Defendant Brienza to call a tow truck. *Id.* Plaintiff states that after Defendant Brienza spoke to him and screamed at him, Defendant Brienza forced Plaintiff to drop to his knees, put his pistol to Plaintiff's head, held out a breathalyzer, and told Plaintiff to blow. *Id.* When Plaintiff requested a lawyer, Defendant Brienza told him to "hold on a second because he had his lawyer with him and then said that I needed to be bleeding or they couldn't give me any drugs anyway." *Id.* Plaintiff reports that Defendant Brienza then hit him above his right eye with the butt of his pistol, knocking him unconscious. *Id.* When Plaintiff woke up, Defendant Brienza was flicking Plaintiff's wound. *Id.* Defendant Brienza screamed at Plaintiff, asked about drugs, and rifled through Plaintiff's pockets. *Id.* Plaintiff denied having any drugs. *Id.* When an ambulance arrived at the scene, Defendant Brienza told the EMTs that Plaintiff crashed his motorcycle and "had assaulted the police and was about to become an organ donor."

*Id*.  After several interactions between the EMTs, Defendant Brienza, and Plaintiff, another police car arrived with Officers Carpenter and Lane.  *Id.* at 1085-86.  Plaintiff was then placed in the ambulance, and Defendant Brienza told the EMTs to "take this organ donor to Grandview."  *Id.* at 1086.  Although Plaintiff attempted to convince the EMTs to take him to another hospital, they took him to Dayton Osteopathic Hospital, also known as Grandview Hospital.  *Id*.

Plaintiff asserts that when he arrived at Grandview, Defendant Brienza was already there. *Id*.  Defendant Brienza made several negative statements about Plaintiff to "everyone in the ER." *Id*.  He also produced an authorization form for Plaintiff to sign.  *Id*.  Plaintiff indicates that based on Defendant Brienza's statements concerning organ donation, he was terrified and refused to sign. *Id*.  At that point, Defendant Brienza punched him near his open wound.  *Id*.  Plaintiff made several disparaging remarks, hoping to force a separation between him and Defendant Brienza.  *Id*. However, he "quickly found out that no one at Grandview would say or do anything to intervene with Nicholas Brienza's continued assault of [his] person nor did anyone do anything at any time while Brienza was present to assure [him] that he would not kill [him]."  *Id*.

Plaintiff states that then all of the men (including medical staff and police) went across the room, leaving him with Defendant Nicole Van Horne, one of the Grandview medical staff.  *Id*. When Plaintiff asked Defendant Van Horne to buy him Tylenol at the gift shop, she indicated that the gift shop was closed but that she had Tylenol that he could have.  *Id*.  Plaintiff told her that he would not sign an authorization for treatment, she said that it was ok, and Plaintiff took the pill. *Id.* at 1086-87.  Defendant Van Horne then asked if he would like oxygen to help with his headache.  *Id*.  After accepting the oxygen tube, McIntosh[6] approached them and removed the oxygen tube.  *Id.* at 1087.  According to Plaintiff, Defendant Van Horne told McIntosh that "she

---

[6] Plaintiff named Christopher McIntosh, M.D., as a Defendant in this case.  (Doc. #9).  The Court dismissed all claims against Defendant McIntosh.  (Doc. #107).

has gotten [him] to take an [A]tivan (lorazepam)." *Id*. When Plaintiff asked Defendant Van Horne about it, she told him "that it's not her fault that [he is] too stupid to know what an [A]tivan is." *Id*.

According to Plaintiff, he was then put back into the ambulance and taken back to the original scene. *Id*. Once there, "at least three more videos were made." *Id*. While recording the videos, Plaintiff says that he "kept saying things like take me to Miami Valley Hospital, don't take me to Grandview, I want a lawyer, why did you hit me in the eye?" *Id*. According to Plaintiff, his statements upset Officer Lane, and Officer Lane threatened to call Defendant Brienza. *Id*.

Plaintiff asserts he was then taken back to Grandview Hospital. *Id*. When he arrived, Defendant Spears was there and started "telling everyone" about Plaintiff. *Id*. Defendant Spears then instructed Plaintiff to sign the admission papers. *Id*. Plaintiff told him that he would not sign anything without speaking to an attorney. *Id*. Defendant Spears told Plaintiff that he had spoken to Plaintiff's attorney, Dennis Lieberman, and that Mr. Lieberman apologized for "getting [Plaintiff] off from assaulting police" and said that Plaintiff should sign the forms. *Id*. When Plaintiff told Defendant Spears to call Mr. Lieberman back and fire him, Defendant Spears was enraged and punched Plaintiff in the jaw. *Id*.

Plaintiff states that shortly thereafter, the police and doctors argued about "who is going to fill out the pink slip." *Id*. McIntosh eventually agreed to fill it out and "express[ed] his disgust at the way [Plaintiff] respond[s] to police questioning and [made] several claims about how smart he is and how much he knows about the law and that 'they' (meaning Kettering Adventist Healthcare, Dayton Osteopathic Hospital, Nicolas Brienza, Joshua Spears, Nicole Van Horne, Shawn Louis [Marein], and David Jenkins) are going to teach [Plaintiff] a lesson about insulting the police and about how the law works in Ohio." *Id*. According to Plaintiff, he requested an attorney, refused

5

all medical treatment and medications at Grandview Hospital, indicated that he had a right to determine who provides his medical treatment, and informed them that he would file a lawsuit if he was not immediately released or transferred to a different hospital. *Id.*

Plaintiff states that Defendants Brienza and Spears continued to assault and batter him for approximately five hours or until about 7:00 a.m. *Id.* They continued to insist that he sign consent forms, and Plaintiff continued to insist that he was entitled to speak to an attorney. *Id.* Every time Plaintiff requested an attorney, he was struck on the face. *Id.* According to Plaintiff, the "repeated striking of [his] face" by Defendants Brienza and Spears caused all of the damage to his face and eye that is noted in the medical file. *Id.* Further, Plaintiff states that Defendant Spears placed a gun to the back of Plaintiff's head and threatened to shoot him. *Id.* In addition, Defendant Brienza told the nurse to write that Plaintiff's pain was at a level 10, stating "We can't give him any drugs if he is not in pain." *Id.* at 1088. Plaintiff indicates that Defendant Brienza was the "Dayton Police at bedside" noted in the nurse's notes. *Id.* Plaintiff asserts that both Defendants Brienza and Spears "acted in a way to cause unwanted contact" with Plaintiff, and such conduct "was and still is offensive and harmful …." *Id.* at 1087-88. Further, Plaintiff states that their conduct shows "deliberate indifference to such suffering … and did knowingly Intentionally Inflict[] Emotion Distress upon [him]." *Id.*

In addition, Plaintiff states that Defendants Brienza, Spears, and Marein "instructed a female individual in a nurse[']s uniform to give [him] an enema to search [his] anus for drugs and also to gratify themselves sexually and that during the process all three individuals made sexual comments and displayed a distinct sexual schadenfreude …." *Id.* at 1088. According to Plaintiff, the enema "contained some form of ethyl alcohol for the purposes of increasing [his] blood alcohol

levels and also to further disorient [him]." *Id*. The enema was performed before any blood draw or uranalysis. *Id*.

Plaintiff reports that Defendant Marein posed as Defendant Jenkins and Defendant Jenkins knew that Defendant Marein "was posing as him in an attempt to confuse [him].… *Id*. at 1088-89. According to Plaintiff, "at one point during the intentional drug overdosing(s)[,] Jenkins tells [Marein] that he is not going to go along with saying it was him if [Marein] kills [him] with a drug overdose, Marein tells him to stop being such a baby and not to worry because [Plaintiff] will live, [Marein] says to Jenkins 'He may wind up being a vegetable, but he will live." *Id*. at 1089. According to Plaintiff, when Defendant Marein made that statement, he laughed "maniacally" and "induce[d] the feeling of terror" in Plaintiff. *Id*.

Plaintiff states that Defendant Ravine injected or ordered the injection of contrast dye into his body without his consent or authorization and in the face of his direct refusal. *Id*.

Plaintiff states that Defendants Marein, Van Horne, Jenkins, and Ravine[7] "acted to cause unwanted contact" with Plaintiff that "was and still is offensive and harmful to [him]. *Id*. at 1088-89. Further, their actions demonstrate a deliberate indifference to his human rights, rights of due process, and "all other torts" that he claimed in his First Amended Complaint. *Id*. Finally, Plaintiff asserts that these Defendants intentionally inflicted emotional distress upon him. *Id*.

Plaintiff states, "the drugs that were given to me intravenously immediately felt like 'despair, sickness, confusion, and dirtiness in a bottle' and such drugs had an instant negative effect on my mental process and my physical wellbeing and that such negative effects were long lasting and likely permanent." *Id*. at 1089. According to Plaintiff, the drugs "harmed the delicate balance of [his] microbiome …," causing him to gain weight. *Id*. They also "had a severe negative effect

---

[7] Plaintiff also makes similar statements about Defendant Stephanie Horne. (Doc. #161-7). However, as Plaintiff has not moved for summary judgment against her, the undersigned will not address these statements.

on [his] ability to recall memories quickly." *Id.*  Plaintiff believes, based on statements from Defendants Brienza and Spears, that those drugs were given as a "punitive measure," "without regard for [his] continued request for due process," and "in the direct face of a specific refusal." *Id*.  Since Plaintiff's release from Dayton Osteopathic Hospital, he has experienced problems with his bowel movements, he had "an abrupt change in [his] sexual tendencies," and he is "easily triggered into recalling such horrifying events." *Id*.

Plaintiff asserts that Defendants Kettering Adventist Healthcare and Dayton Osteopathic Hospital, "by policy or lack of policy, acted in a way that allowed employee defendants[] and Nicolas Brienza and Joshua Spears to cause unwanted contact with myself …." *Id.* at 1088. According to Plaintiff, these Defendants' actions and/or policy/lack of policy demonstrate deliberate indifference to his rights of due process. *Id.*  Further, Plaintiff states that Defendants intentionally inflicted emotional distress on him.  *Id.*  Plaintiff asserts that "the experiences suffered while 'in custody' [at] Dayton Osteopathic Hospital and Kettering Adventist Healthcare were a direct cause of several debilitating mental and physical dysfunctions that [he] now experience[s] including but not limited to PTSD." *Id.* at 1090.

### A.    Kettering Defendants

Plaintiff moves for summary judgment against Defendants Dayton Osteopathic Hospital, Kettering Adventist Healthcare, Marein, Van Horne, Ravine, and Jenkins "for the torts of assault and/or battery and intentional infliction of emotional distress …."  (Doc. #161, *PageID* #1027).

As an initial matter, Plaintiff claims that Defendants Kettering Adventist Healthcare and Dayton Osteopathic Hospital "refused to turn over requested documentation during discovery that would have shed light on the facts of who was actually at the hospital while the Plaintiff was there as well as how the Plaintiff arrived and if he was taken out of the hospital and brought back,

including other details." *Id.* at 1030. In support, he attaches Plaintiff's First Request for Production of Evidence Directed at Kettering Adventist Healthcare and Dayton Osteopathic Hospital (Doc. #161-1), Defendants Dayton Osteopathic Hospital and Kettering Adventist Healthcare's Responses to Plaintiff's Requests for Production of Evidence (Doc. #161-2); and Plaintiff's First Set of Interrogatories to All Defendants (Doc. #161-3). According to Plaintiff, Defendants did not respond to his Interrogatories. (Doc. #161, *PageID* #1030). Plaintiff later reiterates that all of the Kettering Defendants failed to respond to his discovery requests "that would provide factual evidence of who was at Dayton Osteopathic Hospital and what, if any, policy Kettering Adventist Healthcare have in place to protect persons from abuse that they would be responsible for within their facilities and other specific facts of what happened." *Id.* at 1038. Similarly, Plaintiff states that, "[d]ue to a lack of response to discovery requests it is assumed by the Plaintiff that [Defendants Jenkins, Van Horne, and Ravine] admit their parts as claimed by the Plaintiff." *Id.* (citing Doc. #9, *PageID* #s 148, 152).

To the extent that Defendants did not respond or did not adequately respond to Plaintiff's discovery requests, the proper method for challenging Defendants' responses or lack thereof is a motion to compel as set forth in the Federal Rules of Civil Procedure. The undersigned will not assume, based solely on Plaintiff's assertions in his Motion for Summary Judgment, that Defendants admit to Plaintiff's allegations.

The Kettering Defendants oppose Plaintiff's Motion for Summary Judgment, asserting that Plaintiff "fails to demonstrate that there are no issues of genuine fact and that he is entitled to judgment as a matter of law on any of his claims." (Doc. #176, *PageID* #s 1441-42). In support, the Kettering Defendants provided Declarations from Defendants Van Horne, Jenkins, and Marein.

(Doc. #s 176-1, 176-2, 176-3). All three Defendants indicate that they are physicians licensed to practice in Ohio. *Id.*

Defendant Marein states that he was not working at Grandview Medical Center on or about September 13, 2017. (Doc. #176-3, *PageID* #1466). He denies participating in the care of Plaintiff; directing others to do or not to do anything regarding Plaintiff; making sexually oriented comments about Plaintiff; impersonating Defendant Jenkins; prescribing or ordering the delivery of medication to Plaintiff; and causing or permitting unwanted, offensive, or harmful contact to Plaintiff. *Id.* at 1466-67.

Both Defendants Van Horne and Jenkins indicate that they participated in the care of Plaintiff at Grandview Medical Center Emergency Department on September 13, 2017. (Doc. #176-1, *PageID* #1458); (Doc. #176-2, *PageID* #1462). Plaintiff arrived at Grandview Medical Center Emergency Department at 2:32 a.m. on September 13, 2017 "apparently after having been involved in a motorcycle accident." *Id.* He "presented with obvious head trauma," "displayed disoriented and incoherent behavior," "made inconsistent complaints regarding pain, complaining of pain everywhere and then pain nowhere," and "was unable or unwilling to answer some his caregivers' basic questions about his medical condition." *Id.* at 1459, 1462. Based on their personal observations, the providers in Plaintiff's care team (including Defendants Van Horne, Jenkins, and McIntosh) concluded that Plaintiff "lacked the cognitive capacity to make an informed decision to refuse medically necessary emergency stabilization and treatment at that time." *Id.* at 1459, 1463. In accordance with their conclusion, his care team "determined and carried out the medically necessary course of treatment to stabilize [Plaintiff], which included performing a physical exam, blood testing, urine screening, urinalysis, electrocardiogram, obtaining appropriate imaging, and suturing his facial laceration." *Id.* According to Defendants

Van Horne and Jenkins, Plaintiff did not refuse all medical treatment. *Id.* Instead, "[a]t times he would refuse a treatment or medication and then change his mind and consent to it." *Id.* Nonetheless, "Plaintiff's refusals were honored to the extent that they were medically reasonable and did not prevent the stabilization or other emergency care of [Plaintiff]." *Id.* at 1459-60, 1463. Defendants Van Horne and Jenkins state that all diagnoses, physical exam findings, and lab and imaging results were discussed with and/or explained to Plaintiff. *Id.* at 1460, 1463. They indicate that although Fentanyl was ordered to be available, it was never administered to Plaintiff. *Id.* Defendants Van Horne and Jenkins state that they "have no information – whether from personal observation or otherwise – to suggest that [Plaintiff] was ever given medication to facilitate memory loss, punched, threatened at gun-point, threatened with murder, raped, given a colonoscopy or enema, or had his heart stopped during his stay at Grandview Medical Center." *Id.* at 1460, 1464. Both Defendants assert that they did not cause offensive, unwanted, or harmful contact to Plaintiff and did not demonstrate deliberate indifference to Plaintiff's physical, emotional, or mental condition. *Id.* at 1461, 1464. Further, Defendants Van Horne and Jenkins affirm that they "acted in good faith upon information and knowledge thought by [them] to be reliable." *Id.* at

Defendant Van Horne declares that she did not trick Plaintiff into taking an Ativan (lorazepam) pill by claiming it was generic Tylenol (acetaminophen), and she did not make comments to anyone to suggest otherwise. (Doc. #176, *PageID* #1460). Indeed, Plaintiff was never given Ativan in pill form during his stay. *Id.* He was, however, "appropriately administered 1 mg of Ativan intravenously a few hours after he arrived at Grandview Medical Center out of medical necessity." *Id.* Defendant Van Horne indicates that she reviewed Defendant Marein's Declaration and states that the statements within it are true. *Id.* at 1461.

Defendant Jenkins states that he did not observe Defendant Marein attempting to impersonate him or otherwise learn that he had ever attempted to impersonate him. (Doc. #176-2, *PageID* #1464). Further, to the best of Defendant Jenkins' knowledge and belief, Defendant Marein did not participate in the care provided to Plaintiff or interact with him. *Id.* Indeed, Defendant Jenkins did not see Defendant Marein at any time during Plaintiff's stay at Grandview. *Id.* In addition, Defendant Jenkins asserts that he did not observe any other person causing or permitting offensive, unwanted, or harmful contact to Plaintiff or demonstrating a deliberate indifference to Plaintiff's physical, emotional, or mental condition. *Id.* He denies ever making sexually oriented comments about Plaintiff, taking any sexually oriented action toward Plaintiff, or observing others engaging that behavior. *Id.*

### i. Intentional Infliction of Emotional Distress

Although Plaintiff moves for summary judgment on his claim for intentional infliction of emotional distress against all of the Kettering Defendants, District Judge Rice previously dismissed the intentional infliction of emotional distress claims against Defendants Dayton Osteopathic Hospital, Kettering Adventist Healthcare, Van Horne, Ravine, and Jenkins. (Doc. #95, *PageID* #s 683-92); *see* Doc. #90, *PageID* #s 651-52. Accordingly, the undersigned will only address Plaintiff's intentional infliction of emotional distress claim against Defendant Marein.

An intentional infliction of emotional distress claim under Ohio law requires proof that:

> (1) the defendant intended to cause, or knew or should have known that his actions would result in serious emotional distress; (2) the defendant's conduct was so extreme and outrageous that it went beyond all possible bounds of decency and can be considered completely intolerable in a civilized community; (3) the defendant's actions proximately caused psychological injury to the plaintiff; and (4) the plaintiff suffered serious mental anguish of a nature no reasonable person could be expected to endure.

12

*Shugart v. Ocwen Loan Servicing, LLC*, 747 F.Supp.2d 938, 944-45 (S.D. Ohio 2010) (citations omitted).

As Defendant Marein correctly points out, Plaintiff did not discuss his intentional infliction of emotional distress claim against Defendant Marein in his Motion for Summary Judgment. *See* Doc. #176, *PageID* #1455; Doc. #161. However, in his affidavit, as summarized above, Plaintiff discusses Defendant Marein's actions and asserts that Defendant Marein intentionally inflicted emotional distress upon him. (Doc. #161-7, *PageID* #s 1088-89). Plaintiff has the burden of showing the absence of genuine factual disputes from which a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S.Ct. 2505 (1986). Plaintiff has failed to meet his burden. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.") (citation and quotation marks omitted).

Furthermore, Defendant Marein has shown that genuine issues of material exist as to whether Defendant Marein was present at Grandview Medical Center on September 13, 2017, and whether Defendant Marein saw, treated, or interacted with Plaintiff on that date. *See* Doc. #176-1, *PageID* #1461; Doc. #176-2, *PageID* #1464; Doc. #176-3, *PageID* #s 1466-67.

Therefore, Plaintiff's Motion for Summary Judgment against Defendant Marein for intentional infliction of emotional distress should be **DENIED.**

ii.       *Medical Battery*

Plaintiff asserts that Defendants Jenkins, Van Horne, and Ravine[8] "committed act(s) of medical battery under the supervision and responsibility of Dayton Osteopathic [H]ospital and Kettering Adventist Healthcare." (Doc. #161, *PageID* #1039). Further, Plaintiff asserts that Defendants Kettering Adventist Healthcare and Dayton Osteopathic Hospital "are responsible for all actions of any contractor or employees, ect [*sic*] and acts committed by persons known to them to be violent that they allow on their property or the purposes of carrying out violence such as Defendants Breinza [*sic*] and Spears …." *Id.* at 1030.

Under Ohio law, to recover on a claim for battery, a plaintiff must prove an "intentional, unconsented-to touching." *Anderson v. St. Francis–St. George Hosp., Inc.*, 77 Ohio St.3d 82, 84, 671 N.E.2d 225 (1996). "In a medical setting, when a physician treats a patient without his consent, the doctor has committed a battery." *Maglosky v. Kest*, 2005-Ohio-5133, ¶ 24, 2005 WL 2386605 (Ohio Ct. App. 2005) (citing *Est. of Leach v. Shapiro*, 13 Ohio App. 3d 393, 469 N.E.2d 1047 (Ohio Ct. App. 1984)); *see Miller v. MetroHealth Med. Ctr.*, 2018-Ohio-1202, ¶¶ 13-15, 2018 WL 1568421 (Ohio Ct. App. 2018). The *Maglosky* court summarized the general principles regarding medical battery and consent:

> (1) a physician who treats a patient without informed consent commits a battery, even if the treatment is harmless or beneficial; (2) absent legislation to the contrary, the patient's right to refuse medical treatment is absolute until the quality of competing interests is weighed in a court proceeding; (3) if a patient is not competent to consent to medical treatment, an authorized person may consent on the patient's behalf; (4) the patient's consent will be implied if the patient is unable to consent and there exists an emergency requiring immediate action to preserve the life or health of the patient; (5) consent to emergency medical treatment will not be implied if the patient has refused treatment in a manner that satisfies the same

---

[8] Plaintiff also includes Defendant Corneja in his list of Defendants. (Doc. #161, *PageID* #1039). However, Plaintiff did not move for summary judgment against Defendant Corneja. Accordingly, the undersigned will not address Plaintiff's arguments against that Defendant.

> standards of knowledge and understanding required for informed consent; and (6) the existence of consent to medical treatment is a question of fact.

*Maglosky*, 2005-Ohio-5133, ¶ 25 (citing *Leach*, 13 Ohio App. 3d 393, 469 N.E.2d 1047).

Plaintiff contends he "not only refused any medical treatments, but also specifically refused any drugs …." (Doc. #161, *PageID* #1038). In his affidavit, he states that he "refuse[d] all medications and medical treatments at the Grandview facility (Dayton Osteopathic Hospital) and inform[ed] all present that [he has] a right to determine who [he gets] medical treatment from …." (Doc. #161-7, *PageID* #1087). According to Plaintiff, despite his refusal, the Kettering Defendants assaulted and battered him with the drugs Fentanyl, Ketamine, Benadryl, Haldol, Versed, and Ativan. (Doc. #177, *PageID* #1471). Further, as set forth in more detail above, Plaintiff states that Defendant Van Horne tricked him into taking an Ativan pill; Defendant Marein (along with other Defendants) instructed a nurse to give Plaintiff an enema; and Defendant Ravine injected or ordered the injection of contrast dye into Plaintiff's body without his consent. (Doc. #161-7, *PageID* #s 1086-87, 1089). Plaintiff maintains that he was "'Conscious'; awake, alert, aware and certainly cognizant" as demonstrated by his "prudence to assert all of his State and Federally recognized rights of due process at the time of being taken 'into the custody' of Dayton Osteopathic Hospital and Kettering Adventist Healthcare" and by his statements of "lawyer" and "get a warrant" in response to "most all questioning." (Doc. #161, *PageID* #s 1029-30).

The Kettering Defendants "unequivocally deny that during Plaintiff's stay at Grandview he was …" given medication to facilitate memory loss, punched, threatened at gunpoint, threatened with murder, raped, given a colonoscopy or enema, had his heart stopped, administered Fentanyl, or tricked into taking any medication by being told it was something else. (Doc. #176, *PageID* #1454). Defendants Van Horne and Jenkins' Declarations support their denial. Doc. #s 176-1, 176-2. Thus, to the extent that Plaintiff asserts that Defendants committed medical battery by such

15

actions, the Kettering Defendants' statements establish that genuine issues of material fact exist as to whether those actions occurred. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., Ltd.*, 475 U.S. 574, 587, 106 S.Ct. 1348 (1986) (In review of a motion for summary judgment, the Court must view the evidence and all inferences drawn from underlying facts "in the light most favorable to the party opposing the motion.").

However, the Kettering Defendants admit that they did provide some medical treatment to Plaintiff. *See* Doc. #176-1, *PageID* #1459; Doc. #176-2, *PageID* #1463. Specifically, Defendants Van Horne and Jenkins indicate that Plaintiff's treatment included performing a physical exam, blood testing, urine screening, urinalysis, electrocardiogram, obtaining appropriate imaging, and suturing his facial laceration. *Id.* However, the Kettering Defendants challenge Plaintiff's argument that he refused to consent to medical treatment on September 13, 2017, asserting that "[l]egally sufficient consent—and conversely, legally sufficient refusal to consent—requires that the plaintiff had the requisite cognitive capacity." (Doc. #176, *PageID* #1443). According to the Kettering Defendants, Plaintiff lacked the requisite cognitive capacity to make informed healthcare decisions. *Id.* In support, the Kettering Defendants point to the Declarations of Defendants Van Horne and Jenkins. *Id.* at 1452. As noted above, in both Declarations, Defendants state that Plaintiff arrived at the hospital with obvious head trauma; displayed disoriented and incoherent behavior; made inconsistent statements regarding pain; and was unwilling or unable to answer some of his caregivers' basic questions about his medical condition. (Doc. #176-1, *PageID* #1459); (Doc. #176-2, *PageID* #1462). Based on their observations, Plaintiff's care team "collectively concluded that in [their] reasonable medical judgment, [Plaintiff] lacked the cognitive capacity to make an informed decision to refuse medically necessary emergency stabilization and treatment at that time." *Id.* at 1459, 1463. Further, Defendants Van Horne and

Jenkins maintain that Plaintiff did not refuse all medical treatment. *Id.* at 1459, 1463. Instead, "[a]t times he would refuse a treatment or medication and then change his mind and consent to it." *Id.* Moreover, the Kettering Defendants assert, "Plaintiff failed to obtain or put forth any evidence, let alone expert testimony, demonstrating that he possessed the requisite mental capacity to make a legally sufficient informed refusal of the Kettering Defendants' emergency stabilizing treatment." (Doc. #176, *PageID* #1454).[9]

To the extent that Plaintiff asserts that the Kettering Defendants committed medical battery by performing a physical exam, blood testing, urine screening, urinalysis, and an electrocardiogram; obtaining appropriate imaging; and suturing his facial laceration, the Kettering Defendants have shown that there are genuine issues of material fact as to whether (1) Plaintiff refused all medical treatment at Dayton Osteopathic Hospital; (2) Plaintiff had the cognitive capacity to consent—or refuse to consent—to medical treatment; and/or (3) Plaintiff "refused treatment in a manner that satisfies the same standards of knowledge and understanding required for informed consent." *Maglosky*, 2005-Ohio-5133, ¶ 25 (citing *Leach*, 13 Ohio App. 3d 393, 469 N.E.2d 1047); *see Troche v. Crabtree*, 814 F.3d 795, 798 (6th Cir. 2016) ("In considering a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party.") (quoting *Hall v. Warren,* 443 F. App'x 99, 106 (6th Cir. 2011)) (internal quotation marks omitted).

Moreover, Defendant Marein has shown that genuine issues of material fact exist as to whether he was present at Grandview Medical Center on September 13, 2017, and whether

---

[9] The Kettering Defendants also rely on what they call their "affirmative obligation to treat" Plaintiff under EMTALA. (Doc. #176, *PageID* #1449). They maintain that, under EMTALA, "[i]f an individual comes to a hospital with an 'emergency medical condition,' the hospital is 'required to stabilize [that] medical condition before discharging the patient.'" *Id.* at 1454 (quoting *Elmhirst v. McLaren N. Michigan*, 726 F. App'x 439, 444 (6th Cir. 2018) (citing 42 U.S.C. § 1395dd)) (alteration in original).

Defendant Marein saw, treated, or interacted with Plaintiff on that date.  *See* Doc. #176-1, *PageID* #1461; Doc. #176-2, *PageID* #1464; Doc. #176-3, *PageID* #s 1466-67.

Accordingly, Plaintiff's Motion for Summary Judgment against the Kettering Defendants for medical battery should be **DENIED.**

B.      *Defendant Brienza and Spears*

Plaintiff moves for summary judgment against Defendants Brienza and Spears "for the torts of assault and/or battery and intentional infliction of emotional distress …."  (Doc. #161, *PageID* #1027).   Plaintiff asserts that, because "the medical file provided by defendants is inconclusive as to whether or not the Plaintiff was assaulted or was injured in a motorcycle crash, this point of issue along with the fact of whom it was that assaulted the Plaintiff can be decided on the preponderance of facts available to the court."  *Id.* at 1039.  Specifically, Plaintiff points to his affidavit that "includes statements of harm that these defendants did act in tort upon the Plaintiff by way of assault, assault and battery and Intentional Infliction of Emotional Distress and sexual battery or rape as the court may decide."  *Id.* ("a factual statement from the Plaintiff that states specifically how he came by his injuries should suffice as factual evidence.").  Further, Plaintiff states that because Defendants Brienza and Spears did not respond to his discovery requests, he assumes that Defendants "admit their parts as claimed by Plaintiff."  *Id.*  Later in Plaintiff's Motion, he also cites Exhibit C—Plaintiff's Change.org petition—from the Kettering Defendants' Answer and Counterclaim (Doc. #20-3) as evidence of Defendants' Brienza and Spears' assault. The petition includes Plaintiff's allegations of what occurred at Grandview Medical Center and a picture of Plaintiff.  (Doc. #20-3).

Defendants Brienza and Spears oppose Plaintiff's Motion, asserting that their affidavits, cruiser video of the incident, and Plaintiff's own prior statements establish that "[n]either Officer

Brienza nor Officer Spears had any interactions with the Plaintiff that evening ….." (Doc. #171, *PageID* #s 1407-08). In their affidavits, Defendants Brienza and Spears state that they "never struck or otherwise mistreated the Plaintiff …." (Doc. #171-5, *PageID* #1424); (Doc. #171-6, *PageID* #1426). Further, they both indicate that they were not at the accident scene or at Good Samaritan Hospital.[10] (Doc. #171-5, *PageID* #1424); (Doc. #171-6, *PageID* #1426).

Defendants Brienza and Spears also provided the cruiser camera video,[11] a transcript of the cruiser camera video (Doc. #171-4), and an affidavit from Dayton Police Officer Andrew Lane (Doc. #171-3). In Officer Lane's affidavit, he states that he and Officer Mathew Carpenter were dispatched to a motorcycle accident on Riverside Drive in Dayton, Ohio on September 13, 2017. (Doc. #171-3, *PageID* #1419). Officer Lane indicates that the cruiser camera for their Dayton Police cruiser was on when they arrived, and it captured their conversation and video of their interaction with Plaintiff. *Id.* He explains that the video shows that when they arrived, Plaintiff was lying in the grass on the side of the road and a motorcycle was on its side on the sidewalk. *Id.* It also shows him, Officer Carpenter, and the Dayton Paramedics responding to the accident. *Id.* at 1420. According to Officer Lane, "no one mistreated the Plaintiff during this incident. The video captures the Plaintiff telling is that he is 'a little buzzed' when we approach him. The video concludes as the Plaintiff is placed in the back of the ambulance and Officer Carpenter and I return

---

[10] Defendants Brienza and Spears also refer to "Good Samaritan Hospital" earlier in their affidavits: "I have learned that the Plaintiff has filed a lawsuit against me and made allegations that I mistreated him on September 13, 2017 at an accident scene and then later at Good Samaritan Hospital." (Doc. #171-5, *PageID* #1424); (Doc. #171-6, *PageID* #1426). However, Plaintiff does not allege that he was "mistreated" by Defendants at *Good Samaritan Hospital*; he claims that Defendants "mistreated" him at Dayton Osteopathic Hospital, also known as Grandview Medical Center. *See* Doc. #9, *PageID* #126. It is not clear if this is a mistake by Defendants Brienza and Spears. In their Memorandum in Opposition to Plaintiff's Motion, Defendants indicate that their affidavits, they aver that they did not visit Plaintiff at Grandview Hospital. (Doc. #171, *PageID* #1409).
[11] District Judge Rice granted Defendants' Motion for Leave to File Video Evidence (Doc. #172). (Notation Order dated Apr. 11, 2023). The video was submitted to the Clerk's Office and forwarded to Chambers.

to our police cruiser." *Id.* After reviewing the video, the undersigned concludes that it appears to match Officer Lane's description.

Finally, Defendants Brienza and Spears included a copy of Plaintiff's "Dayton Police Department Professional Standards Bureau Complaint Form" (Doc. #171-2) as well as an affidavit from Eric Sheldon, a Lieutenant in the Dayton Police Department in charge of the Professional Standards Bureau (Doc. #171-2).  Lieutenant Sheldon states in his affidavit that Plaintiff filed his complaint with the Professional Standards Bureau on March 8, 2018, alleging that he was tortured by Dayton Police Sergeant Brian Lewis at Riverside Drive and the Grandview Hospital Emergency Room on September 13, 2017.  (Doc. #171-1, *PageID* #1412).  According to Lieutenant Sheldon, when Plaintiff was notified that Sergeant Brian Lewis works for the Montgomery County Sheriff's Office in the Regional Dispatch, Plaintiff stated that it was the officer who arrived at the scene with Officer Mathew Carpenter that abused him.  *Id.* at 1412-13.  When Plaintiff was told that Officer Andrew Lane was the officer who arrived with Officer Carpenter, Plaintiff said that it was Officer Lane that abused him.  *Id.* at 1413.  According to Lieutenant Sheldon, Plaintiff then crossed out Brian Lewis' name on his printed statement and replaced it with Andrew Lane.  *Id.*  Plaintiff's statement (attached to the Complaint Form) shows that Brian Lewis' name is crossed out and "Andrew Lane" is written in.  (Doc. #171-2, *PageID* #1415-18).  In the complaint, Plaintiff alleges, in part, that Andrew Lane responded to the 911 call, knocked him unconscious with his gun, told the EMTs to take him to Grandview Hospital, continued to slap, flick, and punch him at the hospital, and assaulted and tortured him for over an hour.  *Id.*  These allegations appear to very similar to the allegations Plaintiff now makes against Defendant Brienza.

Although Defendants Brienza and Spears refer to Good Samaritan Hospital instead of Dayton Osteopathic Hospital in their Declarations, they also specifically state that they "have

never struck or otherwise mistreated Plaintiff." (Doc. #171-5, *PageID* #1424); (Doc. #171-6, *PageID* #1426). Their denials stand in direct contrast to Plaintiff's statements. The cruiser camera video, transcript, and Officer Lane's Declaration support Defendant Brienza's statement that he was not at the scene. *See* Doc. #s 171-3, 171-4. As mentioned above, Plaintiff maintains that he was taken back to the scene from the hospital to record new videos. (Doc. #161-7, *PageID* #1087). However, viewing the evidence in the light most favorable to Defendants, the undersigned finds that genuine issues of material fact exist as to whether Defendant Brienza was present at the scene before Plaintiff was taken to the hospital and whether Defendants Brienza and Spears mistreated or otherwise harmed Plaintiff. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (in ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). Accordingly, Plaintiff's Motion for Summary Judgment against Defendants Brienza and Spears should be **DENIED**.

## IT IS THEREFORE RECOMMENDED THAT:

> Plaintiff's Motion for Summary Judgment Against Defendants Dayton Osteopathic Hospital, Kettering Adventist Healthcare, Shawn Marein, Nicole Van Horne, Shannon Ravine, David Jenkins, Nicholas Brienza, and Joshua Spears (Doc. #161) be **DENIED**.

July 24, 2023

*s/Peter B. Silvain, Jr.*
Peter B. Silvain, Jr.
United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).